No. 20-13459-F

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

ISAAC SEABROOKS,
*Movant/Appellant*,

v.

UNITED STATES OF AMERICA,
*Respondent/Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of Florida

_____

APPELLANT ISAAC SEABROOK'S MOTION
FOR CERTIFICATE OF APPEALABILITY

_____

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER
BRENDA G. BRYN
ASSISTANT FEDERAL PUBLIC DEFENDER
Attorneys for Appellant
One E. Broward Boulevard, Suite 1100
Fort Lauderdale, Florida 33301
Tel: (954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(28 U.S.C. § 2255 APPEAL)

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## Case No. 20-13459-F

Appellant Isaac Seabrooks files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Abrams, Stewart, Assistant Federal Public Defender

Adeduntan, Rilwan, Assistant United States Attorney

Agarwal, Amit, Assistant United States Attorney

Bloom, Honorable Beth, United States District Judge

Bryn, Brenda, Assistant Federal Public Defender

Caruso, Michael, Federal Public Defender

Day, Timothy M., Assistant Federal Public Defender

Fajardo, Orshan Ariana, United States Attorney

Ferrer, Wifredo A., Former United States Attorney

Goodman, Honorable Jonathan, United States Magistrate Judge

Greenberg, Benjamin G., Assistant United States Attorney

McAliley, Honorable Chris M., United States Magistrate Judge

Smachetti, Emily, Assistant United States Attorney

Seabrooks, Isaac, Defendant/Appellant

Torres, Honorable Edwin, G., United States Magistrate Judge

United States of America, Plaintiff/Appellee

Vazquez, Jr., Ignacio Jesus, Assistant United States Attorney

Watson, Brooke C., Assistant United States Attorney

*s/Brenda G. Bryn*
Brenda G. Bryn

# APPELLANT'S MOTION FOR
# CERTIFICATE OF APPEALABILITY

Appellant Isaac Seabrooks, through undersigned counsel, respectfully requests that the Court grant him a certificate of appealability ("COA") on the following question:

> In light of the intervening decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), did the district court err in denying Seabrooks' motion to vacate his Count 1 conviction under 18 U.S.C. § 922(g)(1), which – as *per* the court's instructions – could have been predicated on a theory of aiding and abetting his co-defendant's illegal possession of a firearm as a convicted felon, without proof Seabrooks knew his co-defendant was a felon at the time of the gun possession?

In support thereof, he states:

## Procedural Background

### The Charges

On August 5, 2014, a federal grand jury returned an indictment charging Isaac Seabrooks and Nigel Butler in Count 1 with being felons in knowing possession of firearms and ammunition in or affecting interstate commerce on July 23, 2014, in violation of 18 U.S.C. § 922 (g)(1), and § 924(e)(1); and in Count 2 with possessing stolen firearms and ammunition that had been transported in interstate commerce in

violation of 18 U.S.C. § 922(j).  In both counts, the grand jury specified

that the firearms and ammunition each defendant possessed were:

1. One Raven Arms .25 Caliber pistol;

2.  Two Amadeo Rossi .38 caliber pistols;

3.  Six rounds of .25 caliber ammunition; and

4.  Four rounds of .38 special caliber ammunition.

(DE-CRIM 13).[1] The grand jury, notably, did not charge either defendant

with 18 U.S.C. § 2 (aiding and abetting).  Nor did the grand jury specify

that either defendant knew of his prohibited felon status at the time of

the gun possession, which – as per *Rehaif v. United States*, 139 S.Ct. 2191

(2019) – is an essential element of any § 922(g) offense.

Butler pled guilty to both counts, as charged. (DE-CRIM 73).

Seabrooks, however, exercised his right to trial.

## The Trial

<u>The Government's Case</u>. Park Ranger Smith testified that at 5:00

p.m. on July 23, 2014, she saw a blue Cadillac entering the parking lot of

Grapeland Park in Miami, Florida. The car parked next to a green truck.

---

[1] References to the underlying criminal case, No. 14-20558-civ-BLOOM,
will be denoted as "DE-CRIM." References to the civil § 2255 case that is
the basis for this appeal will be denoted as "DE.'

2

The driver then rolled down his window; got out of the car; approached the truck; picked the lock; grabbed a black bag; returned to the driver's seat; and then drove away. (DE-CRIM 142:147-156; 173; 190; 267). During the entire episode, the passenger remained in the car. (DE-CRIM 142:156).

Shortly thereafter, the car returned and parked next to the green truck again. (DE-CRIM 142:160-161). This time, neither occupant exited. They remained inside the vehicle for a short time. Then, they backed up to exit the park. (DE-CRIM 142:162-164). At that moment, Miami police blocked the vehicle from exiting, and removed Nigel Butler from the driver's side, and Isaac Seabrooks from the passenger's side. (DE-CRIM 142:164-165).

After Butler and Seabrooks were extracted, three loaded firearms were found inside the car. There was no dispute that a revolver in a holster was found under the front driver's seat. However, it was unclear where the other two firearms were found.

Officer Rojas, who had extracted Butler, said that he looked into the car from the driver's side, and saw a small pouch laying on the passenger's seat, as depicted in GX3-6. (DE-CRIM 142:187-189). He said

he also saw a firearm stuck between the driver and passenger's seats as depicted in GX3-1 and GX3-2. (DE-CRIM 142:188). Although he later learned that a small semi-automatic gun was found in the pouch, (DE-CRIM 142:189), Rojas acknowledged, at the moment he glanced into the car, he did not know how any of the firearms had gotten to the locations in which he observed them—whether, for instance, the driver who came out of the car with his hands up had "tossed" one or more of the guns before doing so. (DE-CRIM 142:199). Rojas candidly acknowledged that one item depicted in the government's photos, namely, a cushion shown laying on the seat in GX3-1 and GX3-2, had not been positioned like that when he had looked into the vehicle. He believed the cushion had been moved to that position prior to the taking of the photographs. (DE-CRIM 142:211-212).

Notably, when the government introduced photographs of the interior of the car showing each of the guns placed in certain spots, defense counsel objected on foundational grounds: the government had not proved who took the photographs, or when they had been taken. (DE-CRIM 142:143-144, 147, 149, 157, 159, 182-183). Rojas conceded he did not take the photos, nor did he know who had taken them, or what time

they were taken. (DE-CRIM 142:205-206). No one was doing so while he remained on the scene. (DE-CRIM 142:208).

Jose Cruz, the owner of the truck and the guns, testified that upon being notified of the burglary, an officer took him to the truck, showed him the weapons and asked him if they were his – which they were. (DE-CRIM 142:234-235). Cruz was not sure if the officer had the weapons in his hand at that point, or whether he had laid them out on the ground. Cruz was sure, however, that they had been taken out of the car when they were displayed to him. At no point, did Cruz ever look inside the Cadillac. (DE-CRIM 142:228-229, 234-235, 239-240).

Officer Merced arrived at the scene after the defendants had been extracted from the car and handcuffed, and they were sitting on the swale. (DE-CRIM 142:257-259). When Merced approached Seabrooks and explained that he would be taking fingerprints to determine if he had touched the guns, Merced claimed Seabrooks replied, "Oh, well, I touched the little gun, Officer–you'll find my fingerprints on the small gun." (DE-CRIM 142:252-253). However, since Merced did not document that statement in a report, there was nothing to corroborate his testimony. (DE-CRIM 142:266).

Merced remained on the scene and at some point thereafter glanced into the Cadillac car. When he did so, he claimed to have seen a silver revolver with a black grip between the seats and a pink pillow as depicted in GX3-1 and GX3-3. (DE-CRIM 142:254-255). He also walked around to the other side of the car, he claimed, glanced in, and saw a little black pouch, not completely like it is in GX3-6 with no pillow, but he was nonetheless able to see at least a piece of the black pouch. (DE-CRIM 142:254-255). Merced conceded, however, that he did not know when the pouch had been put into the position it was in GX3-6; he had **not** been on the scene when the guns were extracted. Thus, he could **not** say how the interior of the car looked at that moment. (DE-CRIM 142:255).

The case agent, ATF Agent Perez, testified that by the time he arrived at the scene, not only had all of the firearms been "recovered;" there were at least ten Miami police officers there. (DE-CRIM 143:326, 330). Perez was not sure which of the officers had been responsible for removing the guns. He had asked when he had arrived, but "nobody remembered." (DE-CRIM 143:330-332). Perez likewise did not know who put the guns back into the Cadillac so they could be photographed. (DE-CRIM 143:332). While Perez claimed to have seen the crime scene

unit taking photographs at some point, he was not sure exactly when that had occurred. (DE-CRIM 143:321; 324). He recalled that one of the guns shown to him was in a holster, and there was a pistol in a pouch. He conceded that the pistol was not visible from the outside of the pouch, but only when the pouch was unzipped. (DE-CRIM 142:282-283). When the prosecutor asked Perez where the three guns had been recovered from, Perez stated that (as he had been told, but not from his own knowledge) the holstered gun was recovered from the driver's side floorboard, another was recovered from the center console, and the one in the pouch had been in Seabrooks' seat. (DE-CRIM 143:304; 307).

Agent Perez took a taped statement from Seabrooks at the Miami Police Department, after Seabrooks waived his rights. (DE-CRIM 142:286-287; DE-CRIM 143:299). In that statement, Seabrooks emphasized repeatedly that he did not break into the truck; he did not know beforehand that Butler was going to do so; he did not participate in any way in that break-in; and he was not "part of it." He told Perez to check the surveillance camera in the park because "the camera will show so." (GX30:4, 9-11, 16, 19, 23-24, 28).

Seabrooks admitted Butler handed him the guns when he came back to the Cadillac after burglarizing the truck. But Seabrooks said he had immediately placed the guns away from himself on the console/armrest in between the two seats because he did not want to have anything to do with any guns, or to have them anywhere around him. (GX30:6-8, 11, 20; DE-CRIM 143:302-303, 339-340). While he acknowledged he had opened the small black pouch to see what was in it, Seabrooks explained that when he saw a chrome .22 or .25 pistol, he immediately put the pouch with that gun on the armrest between the two seats. He had simply glanced at it, he explained. He never took the gun out. (GX30:15, 17-18). When Perez accused him of "sitting on the gun" when the car was stopped, Seabrooks was in disbelief. "Sitting on what gun?" he asked. There had been no gun in his seat, he insisted. He had not been sitting on any gun. If Perez claimed one was there, Seabrooks said, the police had put it there. (GX30:5, 21-22; DE-CRIM 143:348-351).

Seabrooks denied having told Merced he had touched the gun inside the pouch. He explained he had only admitted that he had touched the pouch, and had told Merced that his fingerprints might be on the pouch. He denied having ever told Merced that his fingerprints might be on the

gun inside.  (GX30:6; DE-CRIM 143:340-341, 343, 345).  And he denied

having taken the gun out of the pouch to see if it was loaded.  He did **not**

check.  From the outside of the other guns, however, he could see they

were loaded. (GX30:14-15).  Seabrooks explained to Perez that it had

been he who made Butler drive back to the scene, because he (Seabrooks)

wanted the guns to be put back into the truck–away from himself.  He

didn't want to ride in any car with guns inside.  (GX30:8, 10, 13-14, 24;

DE-CRIM 143: 359).

When Perez told Seabrooks that he was being charged with being a

felon in possession of a firearm, Seabrooks asked, "How am I being

charged with being a felon in possession of a firearm?  I didn't possess

any gun." (GX30:21).  Perez said that he had "received" the firearms from

Butler when he returned to the car. But Seabrooks explained, "I didn't

receive them to keep them."  He reiterated that he had immediately put

them away from him because he did not want any dealings with "them

guns," and explained:  "It's like someone gives you something and you

don't know what it is and then you put it back." (GX30:22; DE-CRIM

143:341-342).

Seabrooks' fingerprints, notably, were not found on any of the firearms. Perez did not ask for the pouch to be fingerprinted. (DE-CRIM 143:377-378; 452-455). While Perez acknowledged that there were indeed, as Seabrooks had said, cameras in the area of Grapeland park where the break-in occurred, (DE-CRIM 142:285), and that Seabrooks had told him to check the cameras because they would show he did not break into the truck or even get out of the Cadillac, (DE-CRIM 143:389-390), Perez did not do so until over a month after the crime occurred. He claimed he was "busy with other cases." When he finally thought to ask for the video surveillance tapes, he learned that they were only kept for five days, and then taped over. (DE-CRIM 142:285; DE-CRIM 143:387, 392-393).

Perez conceded on cross that–because he had not bothered to secure the readily-available surveillance tapes in a timely fashion–the prosecution had no surveillance showing Butler's break-in of the truck, Seabrooks inside the car during Butler's break-in, or anything that would document how or when the car was searched, the firearms were removed, or they were placed back in the car to be photographed. (DE-CRIM 143:394).

The ammunition found in all three guns had been manufactured outside of Florida, and therefore had traveled in interstate commerce. (DE-CRIM 143:469-471), However, only 2 of the firearms had travelled in interstate commerce: the .25 caliber pistol concealed in the black pouch (GX8), and the .38 caliber pistol found under Butler's seat in a holster (GX9). (DE-CRIM 143:466-469). The .38 caliber pistol (GX10, found in between the driver and passenger seats) was *not* confirmed to have traveled in interstate commerce (DE-CRIM 143:469) – thus eliminating that firearm as a basis for conviction.

Before resting, the prosecutor read the jury a stipulation signed by counsel for both parties that Seabrooks had previously been convicted of a felony "involving theft and the possession of a firearm;" Butler had previously been convicted of the felony offense of "burglary of an unoccupied conveyance;" neither Seabrooks nor Butler had had their rights restored; and therefore, neither was legally allowed to possess a firearm or ammunition. (DE-CRIM 143:476-477).

The Rule 29 Motion. After the government rested, defense counsel moved the court for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, and *United States v. Edwards*, 166 F.3d 1362 (11th Cir. 1999), which

11

established that the mere touching of contraband for inspection standing alone was not sufficient to establish "possession." (DE-CRIM 143:477-480; DE90). The Court denied the motion. (DE-CRIM 143:481-482).

The Defense Case. Traci Cox, an investigator with the Miami Crime Scene Unit, testified (and her report confirmed) that she was called to the crime scene in Grapeland Park on July 23rd at 6:03 p.m. She arrived at the park at 6:43 p.m.. Therefore, all of her photos were taken *after 6:43 p.m*. (DE-CRIM 143:491, 500-501).

The suspects were no longer on the scene when she arrived. (DE-CRIM 143:503-504). However, Cox noted, Miami police officers remained there and they asked her to process the vehicles and the firearms, and to take photos. (DE-CRIM 143:492-495). When Cox first looked into the Cadillac, only one firearm was visible. (DE-CRIM 143:495). After she photographed everything inside, she noted, an officer took the firearms out to make them safe for her to process for fingerprints. At that point, she took additional photographs of the removed firearms. (DE-CRIM 143:496-497). She identified all 9 photographs in GX3 as photos she had taken. (DE-CRIM 143:498). The one item in those photos that she knew had been moved was the pouch containing the small pistol. She had not

seen that item on the passenger seat originally when she looked into the Cadillac. One of the officers, she explained, had placed the pouch on the passenger seat for the photo in GX3-6 to be taken. She had no idea where that pouch had been originally, or which officer had moved it to the passenger seat. (DE-CRIM 143:499-500).

Virginia Bentley, the manager of Grapeland Park, testified that the only person who had contacted her to obtain the surveillance videos was a defense investigator. By then, the tapes had been taped over. To her knowledge, no law enforcement officer had ever contacted her office to obtain the surveillance tapes. (DE-CRIM 143:525-527).

<u>Renewal of the Rule 29 Motion</u>. After resting the defense case, counsel renewed his motion for judgment of acquittal. The court denied it, stating that whether Seabrooks was in actual or constructive possession was a factual issue for the jury. (DE-CRIM 143:539)

## The Charge Conference

At the charge conference, when the government urged the court to give an aiding and abetting instruction which tracked the language in Special Instruction No. 7 of the Eleventh Circuit's 2010 Pattern

Instructions (DE-CRIM 57:17), counsel for Seabrooks strenuously objected:

> DEFENSE COUNSEL: With regard to the aiding and abetting instruction that the government has included, I don't believe that the evidence in this particular case supports or warrants the submission of that instruction to the jury, so I would object to that.

> AUSA: Your Honor, we believe the aiding and abetting instruction is proven by the fact that–or is supported by the evidence of Mr. Seabrooks riding in the vehicle. There was evidence that the vehicle's window was rolled down while the burglary was happening. He could have been in communication with him. They could have been speaking. And then the return of the group to the site for theft, which is, I think, a common-sense application, I believe that the Defense has as much acknowledged in his cross-examination that this was a continued theft that they wanted to attribute to Mr. Butler. But, in any case, Mr. Seabrooks could be found to have aided and abetted the commission of this crime–aided and abetted the commission of the firearm possession by Mr. Butler.

> The defense has stipulated that he's a convicted felon. The evidence shows that the firearms that Mr. Butler possessed before transferring them to Mr. Seabrooks traveled in interstate commerce, so the elements are met. The government can make its theory to the jury that Mr. Seabrooks' conduct as the passenger, as a lookout, could help accomplish this crime.

> THE COURT: Anything further, Mr. Day?

> DEFENSE COUNSEL: No, Your Honor, just my restatement that I don't–there has to be evidence to support the

instruction, as the Court knows, and I don't think that the predicate has been made in that regard. And that's the basis of my objection.

THE COURT: I think here, where there are two charges, one being a possession of stolen firearms, the aiding and abetting instruction is proper with regard to Mr. Seabrooks' participation. And the request not to include aiding and abetting would be denied and that will be included.

(DE-CRIM 143:541-543).

The court then considered defense counsel's requested theory of defense instruction that "a person is not in possession of an object if the person does no more than touch and inspect the object." Counsel explained that the instruction accurately stated the law as set forth in *Edwards*; that only "slight" evidence was necessary to support a theory of defense instruction; and that standard was met here given Seabrooks' statement that he received the firearms but not to keep them, and had merely unzipped the pouch containing the little gun. (DE-CRIM 143:543-545). The court declined to give the instruction, stating that the "issue in this case is whether Mr. Seabrooks had dominion and control and whether he did no more than just touch and inspect or actually had that control during the time that the weapons were in the car." That was a factual issue for the jury to resolve, and in the court's view, the standard

instruction on actual and constructive possession "would be sufficient to cover [it]." (DE-CRIM 144:565-566). However, the court noted, defense counsel would be free to argue Seabrooks did no more "than touch and inspect, and as such he lacked the dominion and control necessary to find actual possession." (DE-CRIM 144:566).

Prior to closing, the prosecutor asked the court to clarify whether its ruling granting the government's requested aiding and abetting instruction extended to both charges in the indictment:

> AUSA: With respect to the aiding and abetting, in terms of arguing aiding and abetting, I just want to make sure that that is applicable to both of the charges, or was Your Honor's ruling that the aiding and abetting is applicable only to receiving a stolen firearm?

> THE COURT: Well, your requested charge was merely the agency charge so that's the law. I don't believe that there was a request to limit it to–

> AUSA: No, there's not. I just want to make sure when I'm giving my closing argument that I'm within the parameters set by the Court.

> THE COURT: The Court did not set any parameters. This is the law, and you can certainly direct the Jury to the law.

(DE-CRIM 144:567).

# The Court's Instructions to the Jury

Before closing arguments, the Court instructed the jury in pertinent part that:

> Count 1 charges the Defendant with possessing a firearm and ammunition, after having been previously convicted of a felony. ...

> It is a federal crime for anyone who has been convicted of a felony offense to possess a firearm in or affecting interstate or foreign commerce. The Defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt: Number one, the Defendant knowingly possessed a firearm or ammunition in or affecting interstate or foreign commerce; and two, before possessing the firearm or ammunition, the Defendant had been convicted of a felony, a crime punishable by imprisonment for more than one year. ... It is not necessary for the Government to prove that the Defendant knew the firearm had moved from one state to another, only that the firearm did, in fact, move from one state to another. ...

> It is possible to prove the Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged. Ordinarily, any act a person can do may be done by directing another person or agent or it may be done by acting with or under the direction of others.

> A defendant aids and abets another person if the defendant intentionally joins with a person to commit a crime.

> A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.

A defendant is also responsible if the defendant willfully directs or authorizes the acts of an agent, employee or other associate. But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated with the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it. In other words, you must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator.

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

Actual possession of a thing occurs if a person knowingly has direct physical control of it.

Constructive possession of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it later.

Sole possession of a thing occurs if a person is the only one to possess it.

Joint possession of a thing occurs if two or more people share possession of it.

The term "possession" includes actual, constructive, sole, and joint possession.

(DE-CRIM 144:576-580).

## Closing Arguments

During the government's initial closing, the prosecutor argued that Seabrooks knew he had been found "in a car full of guns"—one under the driver's seat, one in the center, and one "either on his seat, [or] in the center console. It may have fallen when he got out, but we know for a fact that he knew there were three guns in the car." (DE-CRIM 144:584). Seabrooks' statement to Officer Merced, and his own statement proved that he "handled the firearms," or at least the gun in the pouch. (DE-CRIM 144:584). He said that he unzipped the pouch, and saw a .25 automatic inside, but he knew about all of the guns because he not only placed the guns into the car; he "controlled them." (DE-CRIM 144:593-594).

According to the prosecutor, Seabrooks' own statement proved that he "received" the guns Butler stole from the truck and that he inspected them. And "he held onto them and he placed them strategically in the car." (DE-CRIM 144:587-588). The prosecutor conceded, because she had to after Cox's testimony, that "obviously, things were moved around." (DE-CRIM 144:590). But, the prosecutor argued, Seabrooks' claim that he was not a "part of" the burglary was unreasonable. "He was a part of

it." If he did not want to be a part of any guns, then he should have left. He had every opportunity. There were bus stops everywhere. "The reason he didn't leave is because he was a part of it." (DE-CRIM 144:591). That they came back to the scene of the crime to put the guns back was "ridiculous," she stated. "They went back to get more things because their intent was to make money." (DE-CRIM 144:592).

The prosecutor urged the jury to convict Seabrooks of both counts because he not only "received" the guns from Butler and placed them into the car, but also "aided and abetted" Butler's theft, and Butler's own possession of the guns:

> AUSA: He aided and abetted Nigel Butler in stealing those firearms and in possessing those firearms. We know those guns were stolen, we know that he possessed them, and we know that he aided Nigel Butler because he assisted him in that robbery. He didn't say "No." He didn't say, "Stop." He didn't say, "Let's put these guns back. Well, I suppose that's what he told the officers.

(DE-CRIM 144:594).

In the defense closing, defense counsel argued that only Butler— who burglarized the truck completely on his own—had direct physical control over the firearms. (DE-CRIM 144:597-598). Seabrooks had said in his statement that "the intent" had been to get money, counsel

emphasized, not "my intent," and he had made clear to Perez that "the intent" to burglarize the truck had been Butler's alone. (DE-CRIM 144:604-605). All the evidence showed, counsel argued, was that Seabrooks "received" the items Butler stole when Butler returned to the car, and that Seabrooks put them in the console/armrest area—away from himself. While indeed, he opened the zippered pouch to see what was inside, when he saw a small chrome .22 or .25 gun inside, he immediately put the pouch in the console area of the car with the other guns. (DE-CRIM 144:598). Seabrooks told Agent Perez over and over in his statement that he did that because he did not want anything to do with any firearms. And, counsel emphasized, none of the evidence the jury had heard contradicted that. (DE-CRIM 144:598). Traci Cox's testimony confirmed that all of the photographs the government had introduced had been taken long after all of the guns had been removed from the car and identified by Cruz, and that GX3-6 showing the pouch with the .25 inside on the passenger seat had been staged. (DE-CRIM 144:606-607).

"Importantly," counsel argued, "receiving an item, touching it, and inspecting it and putting it down is not possession. ... That's not

exercising direct physical control over the item. And that's what they have to prove." (DE-CRIM 144:598-599). The jury had heard the "exact opposite" of that from Seabrooks' statement: "'Get that away from me. I can't be around any firearms. I don't want to be around any firearm.' That's the evidence that you heard." (DE-CRIM 144:599, 614).

Although the jury could have had a videotape of this crime, counsel emphasized, it did not because Agent Perez was "too busy" to request it before weeks passed and it was taped over. That tape would not only have shown what happened during the burglary, but also how and when the firearms were taken out of the car by the Miami police, and put back in. (DE-CRIM 144:614-617). Not one of the government witnesses who testified was able to say what Seabrooks did inside the car, counsel underscored. No one had confirmed the government's suggestion that he had remained inside the car during Butler's burglary as a "lookout." (DE-CRIM 144:617). That was conjecture, guilt by association, and not proof beyond a reasonable doubt. Accordingly, defense counsel argued, the government had not overcome the presumption of innocence, and proved Isaac Seabrooks' guilt beyond a reasonable doubt. (DE-CRIM 144:617-620).

In rebuttal, the prosecutor emphasized Smith's testimony that Butler had rolled down his window before exiting the Cadillac to burglarize the truck. "They" had the window rolled down, the prosecutor argued, so that Seabrooks could aid and abet Butler's "crime:"

> AUSA: Why did they have the window rolled down? So they could communicate, so that [Seabrooks] could sit there, peacefully, look another way, look straight ahead, and say: "There's some weird lady behind us. Be calm. All right. Go ahead." That is aiding and abetting. That's why the instruction is there because this story is obvious, and your common sense does not get checked outside that door. He is a lookout. He is helping this crime happen.

(DE-CRIM 144:621-622).

The prosecutor underscored for the jury that the government had two different ways of proving its case against Seabrooks, and only one of those ways was through actual possession, which required them to decide whether Seabrooks really had those guns, or "was he just curious?" (DE-CRIM 144:622). The "aiding and abetting instruction that you have," the prosecutor noted, was the government's other way of "proving this case." (DE-CRIM 144:622). Before sitting down, the prosecutor highlighted the "value" of the aiding and abetting instruction as an alternative basis for conviction, stating:

AUSA: I want to be very clear, when you go back to the jury room, about the value of that aiding and abetting instruction. One way of proving this case is solely on the actual possession and constructive possession. If you find that that has happened, that the Defendant has actual possession of the gun, the Defendant is guilty. You don't have to consider aiding and abetting. But if you, for whatever reason, have a question about that, you can move on to aiding and abetting and you can determine did ... Isaac Seabrooks ... help Nigel Butler commit this crime? And the answer is: Yes.

We heard about a lot of things from the Defense, but we did not hear about the rolled window down. ... The window was rolled down. Why do that if you're just sitting there? He helped him. His purpose there was to make this crime happen.

(DE-CRIM 144:629-630).

## The Jury's Question, and the Court's Supplemental Instruction

After deliberating for two and a half hours, the jury submitted a note asking: Are the following considered the same as possession:

– receipt of item

– touch of item

– physical inspection of item

(DE-CRIM 95; DE-CRIM 144:637). The court responded that it would remind the jury of its previous instruction on possession, but that also:

I am going to advise them consistent with the law as set forth in *United States v. Edwards* that mere inspection standing

24

alone is not sufficient to establish possession. And that's based on the direct question that was asked [by] the Jury.

(DE-CRIM 144:643). The court then brought the jury into the courtroom and reminded them that "You alone determine the facts of this case;" re-read them the court's prior instruction on "possession;" and added, in response to their specific question, that "mere inspection, standing alone, is not sufficient to establish possession." (DE-CRIM 144:650; DE95).

Approximately a half-hour later, the jury reached a verdict. (DE-CRIM 144:651).

## The Verdict

On the general verdict form, the jury indicated that it unanimously found Seabrooks guilty as to Count 1 (Possession of a Firearm by a Convicted Felon) and Count 2 (Possession of a Stolen Firearm). (DE97).

## The Sentencing

At the January 23, 2015 sentencing, the Court sentenced Seabrooks to the bottom of the enhanced guideline range as an Armed Career Criminal: 188 months on Count 1, 120 months concurrent on Count 2, followed by 5 years supervised release. (DE-CRIM 148:24-25; DE130).

## The Direct Appeal

Seabrooks challenged both his convictions and his ACCA designation on appeal. With regard to his convictions, he argued that the court's aiding and abetting instruction was unwarranted for multiple reasons including that *Rosemond v. United States*, 134 S.Ct. 1240, 1248 (2014) required that he have advance knowledge that Butler was both going to possess a firearm and was a convicted felon, and there was no evidence that he had such knowledge.

In its published decision affirming both the convictions and the sentence the panel claimed that because Seabrooks had only "objected generally to the aiding and abetting instruction at trial, that general objection to the sufficiency of the evidence did not preserve the more specific *Rosemond* claim he now raises." *United States v. Seabrooks*, 839 F.3d 1326, 1334 (11th Cir. Oct. 19, 2016). Accordingly, the panel reviewed for plain error only. *Id.* And pursuant to the plain error standard, it held, it "need not decide" whether *Rosemond* applied to possession of a firearm because neither this Court nor the Supreme Court had yet specifically resolved "whether a defendant's knowledge that the principal was a convicted felon is an essential element of the offense of

aiding and abetting a § 922(g) violation, and the circuits that have addressed it disagree." 839 F.3d at 1337 (citing conflicting decisions from the Ninth Circuit on the one hand, and those of the First, Third, Sixth, and Seventh on the other). "We need not decide this question," the panel stated, "because there can be no plain error when neither the Supreme Court nor this Court has resolved the issue and other circuits are split. Thus, Seabrooks has not satisfied his burden of demonstrating plain error." *Id.* at 1337 (citation omitted).

On certiorari, Seabrooks only challenged his ACCA sentence.

On June 19, 2017, certiorari was denied. *Seabrooks v. United States*, 137 S.Ct. 2265 (June 19, 2017) (No. 16-8072).

**The Motion to Vacate Pursuant to 28 U.S.C. § 2255**

On June 18, 2019, which was within a year of the denial of certiorari, Seabrooks filed a motion to vacate pursuant to 28 U.S.C. § 2255. (DE 1). He argued, *inter alia*, that it was error for the district court to instruct the jury that it could find him guilty of the Count 1 felon-in-possession count on the theory that he aided and abetted Butler's illegal possession of the firearms, without any proof that at the time of his purported aiding and abetting he knew Butler was a convicted felon. As

support, he relied not only upon *Rosemond* but *United States v. Ford*, 821

F.3d 63 (1st Cir. April 13, 2016), where the First Circuit held that for a

defendant to aid and abet a convicted felon's illegal possession of a

firearm in violation of 18 U.S.C. § 2 and § 922(g)(1), the government must

"prove beyond a reasonable doubt that the putative aider and abetter

knew the facts that make the principal's conduct criminal"–namely, that

he was previously convicted of a crime punishable by more than a year in

prison. *Id.* at 68-70, 74.

As support for that holding, Seabrooks noted, the First Circuit in

*Ford* had relied upon two separate lines of authority: (1) the rule set forth

in *Rosemond*, that a person violates § 2, only if the government proves

that he has "'chosen, with full knowledge, to participate in the illegal

scheme,'" *id.* at 68-69, and (2) the general rule of construction set forth in

*Staples v. United States*, 511 U.S. 600, 605 (1994) that *mens rea* is

presumed in any criminal statute without an express *mens rea* element

since a defendant must "know the facts that make his conduct illegal" if

he is exposed to a harsh penalty such as a prison sentence of up to 10

years under 18 U.S.C. § 924(a)(2). (DE 1:42-45). On the latter point,

Seabrooks noted with significance that:

In *United States v. Games-Perez*, 667 F.3d 1136, 1142-1146 (10th Cir. 2012), then-Judge Gorsuch concurred in the judgment based upon an alternative reading of the elements of a § 922(g) offense which is equally persuasive.

(DE 1:44, n. 1). Seabrooks specifically adopted that alternative reading for his case, explaining that:

> Then-Judge Gorsuch acknowledged in *Games-Perez* that he was bound by prior 10th Circuit precedent, which like Eleventh Circuit precedent, holds that there is no *mens rea* requirement in a § 922(g)(1) offense. Nonetheless, then-Judge Gorsuch questioned the validity of the prior panel's reasoning that the government did not have to prove that a § 922(g)(1) defendant knows he himself is a convicted felon, as that "simply can't be squared with the text of the relevant statut[ory text]." The relevant text, he rightly noted, was not limited to § 922(g)(1); it also included § 924(a)(2). And the latter specifically includes the word "*knowingly*." *See* 667 F.3d at 1143 (noting that "§ 922(g) doesn't send anyone to prison for violating its terms. That job is left to § 924(a)(2), which authorizes prison terms for '[w]hoever *knowingly violates*' 922(g);" the prior panel's decision to read the word "knowingly" out of § 924(a)(2) "defies linguistic sense – and not a little grammatical gravity. Ordinarily, after all, when a 'criminal statute . . . introduces the elements of a crime with the word 'knowingly,'" the court applies the word "knowingly" "to each element;" citing *Flores-Figueroa v. United States*, 556 U.S. 646 (2009)(emphasis supplied by then-Judge Gorsuch). Ultimately, he asked, and Seabrooks asks as well: "How can it be that courts elsewhere read a *mens rea* requirement *into* statutory elements criminalizing otherwise lawful conduct, yet when Congress expressly imposes just such a *mens rea* requirement in §§ 922(g) and 924(aa) we turn around an read it *out* of the statute?" 667 F.3d at 1145.

DE 1:44-45, n. 1.

Under all of these authorities, Seabrooks argued, he should be granted a new trial "since – as the government candidly conceded at oral argument in this case – it presented no evidence that [he] knew Butler was a convicted felon." (DE 1:45). And, considering the entirety of the record including the government's closing and rebuttal arguments, there could be no fair assurance that the legally insufficient and unfounded aiding and abetting instruction did not sway the jury to convict him improperly. (DE 1:46-52).

The government responded that Seabrooks was attempting to re-litigate the same claims this Court had rejected on direct appeal, and therefore, his claims were procedurally barred. (DE 5:11-12). According to the government, here there was no "'highly exceptional circumstance' like an intervening change in law that warrants an exception to the rule preventing a rehashing of arguments decided against Petitioner on direct appeal." (DE 5:15).

Even without a procedural bar, however, the government argued, Seabrooks' claim would fail on the merits. First, it argued (as the panel had noted on direct appeal), neither Eleventh Circuit "precedent or the

Supreme Court's jurisprudence had yet addressed whether defendant's knowledge of the principal's status as a felon is necessary, and that Circuits [were] split on the issue."  (DE 5:14).  Second, the government noted, Seabrooks had "stipulated that Butler was a convicted felon who could not possess a firearm." (DE 5:14).

In reply, Seabrooks noted that his direct appeal panel had ***not*** actually decided his *Rosemond*-based argument on the merits because it found that argument to be "new" and therefore reviewed it for plain error only.  (DE 13:5).   Indeed, he emphasized, the panel had explicitly held that it "need not decide" "whether a defendant's knowledge that the principal was a convicted felon is an essential element of the offense of aiding and abetting a § 922(g) violation." (DE 13:5-6). However, he noted, that error "may soon become 'plain' as a result of the Supreme Court's much-anticipated ruling that term in *Rehaif v. United States*, ___ S.Ct. ___, 2019 WL 166874 (cert. granted Jan. 11, 2019) (No. 17-9560), where the petitioner had pressed the argument urged by then-Judge, now Justice Gorsuch in *Games-Perez* – namely, that the word "knowingly" in 18 U.S.C. § 924(a)(2) applies to both the possession and status elements of a § 922(g) crime. Such a holding in *Rehaif* would abrogate the Ninth

Circuit's reasoning in *United States v. Canon*, 993 F.2d 1439 (9th Cir. 1993) – the only decision holding, at the time of his appeal, that to prove aiding and abetting of a § 922(g) offense no greater knowledge than the principal's offense need be proved. Since the government did not have to prove that the principal knew he was a felon, the Ninth Circuit had reasoned in *Canon*, "[n]o greater knowledge requirement applies to [an aider and abetter.]" (DE 13:6-9).

If, however, *Rehaif* were to require knowledge of felon status for the principal's § 922(g)(1) offense, Seabrooks argued, the crime of aiding and abetting that offense would most definitely require at least the same knowledge by the aider and abetter – namely, that the principal was a felon. And that change in the law should require a new trial here. He argued that the prejudice from the unfounded aiding and abetting instruction was clear not only from the government's closing and rebuttal arguments, but because the Count 1 conviction was the basis for the enhanced ACCA sentence. Without a conviction on that count, Seabrooks noted, he would have faced a maximum term of 10 years on Count 2. (DE 13:9-11).

## Post-*Rehaif* Briefing in the District Court

After the Supreme Court handed down its decision in *Rehaif v. United States*, 139 S.Ct. 2191 (June 21, 2019), Seabrooks filed a "Notice of Case-Dispositive, Intervening Decision," noting that in *Rehaif* the Supreme Court had held contrary to every circuit in the country that the term "knowingly" in § 924(a)(2) applied to both the possession and the status elements of a § 922(g) crime. And, contrary to *Rehaif*, there was no knowledge-of-status element in the court's § 922(g) instruction here—which "impermissibly lessened the government's burden of proof on its theory that Seabrooks aided and abetted Butler's illegal gun possession." (DE 15:1-2).

*Rehaif* had not only abrogated this Court's decision in *United States v. Jackson*, 120 F.3d 1226 (11th Cir. 1997) and all of the other circuit cases similarly holding that knowledge of status need not be proved, Seabrooks noted. *Rehaif* had also abrogated the Ninth Circuit's reasoning in *Canon* that an aider and abetter of a § 922(g)(1) offense need not know the principal was a felon, because no greater knowledge was required of an aider and abetter than a principal. (DE 15:2-3). *Rehaif*

was a definitive, case-dispositive change in law for his case, Seabrooks

explained, because under *Rosemond*:

> [A]n aider and abetter must at least have the same level of
> knowledge as the principal. *Id.* at 76-77 (an aider and abetter
> must participate "with full knowledge of the circumstances
> constituting the charged offense"). And there is *no* evidence
> in the record here that [he] knew Butler was convicted of a
> crime punishable by a term of imprisonment in excess of one
> year, **at the time of the gun possession** as *Rehaif* has
> clarified Congress intended in § 924(a)(2) and the law has
> **always** required. ...

> In light of *Rehaif*, and the abrogation of *Jackson* and *Cannon*,
> [the] conviction on Count 1 – which could have erroneously
> been for aiding and abetting Butler's gun possession **without
> any knowledge** Butler was a felon – must be reversed.

(DE 15:2-4).

The government, notably, did not disagree with that analysis in any

respect. It filed **no** response.

### The Magistrate's Report and Recommendation

On May 27, 2020, the magistrate judge issued a Report

recommending that Seabrooks' motion to vacate be denied on grounds

that his claims for relief were "procedurally barred" from consideration,

as "already decided by the Eleventh Circuit on direct appeal." (DE 16:13).

The magistrate acknowledged that (1) in *Rosemond*, the Supreme

Court had held that to convict a defendant of aiding and abetting a §

34

924(c) offense, the government must prove beyond a reasonable doubt that the defendant aider and abetter had advance knowledge that the principal would use or carry a gun during the commission of the predicate drug offense, and (2) Seabrooks "argues that *Rehaif* extends the ruling in *Rosemond* to the offense of aiding and abetting an offense under § 922(g), such that the government had to show Seabrooks knew of Butler's felon status." (DE 16:18). Although that clearly was a new claim that was not raised or decided by the *Seabrooks* panel, the magistrate still found that it was "procedurally barred" unless Seabrooks could meet the exception to the procedural bar rule for an intervening change in law – which, the magistrate found, he had not done. (DE 16:18-19, 21-22).

The intervening change in law exception, the magistrate stated, required that the intervening change in law have "retroactive effect after a judgment of conviction has become final." (DE 16:14). And, the magistrate held, the rule in *Rehaif* was ***not*** retroactive because *Rehaif* did not "constitute a new rule of constitutional law." (DE 16:18 (citing as support: *Yawn v. United States*, 2020 WL 22454, at *2 (M.D. Fla. Jan. 15, 2020) and *Durham v. United States*, 2019 Wl 5617936 (S.D. Fla. Oct. 31, 2019)). (DE 16:18-19)).

The magistrate acknowledged that "even if" it were true, as Seabrooks had argued, that he was factually innocent of Butler's § 922(g)(1) offense because the government did not show he knew Butler was a convicted felon as required by *Rehaif*, that would be insufficient to grant him relief "because *Rehaif* has not been applied retroactively." (DE 16:19).

### Objections to the Report and Recommendation

In his Objections, Seabrooks pointed out that the magistrate did not disagree with him on the merits, and indeed, had ***not*** disputed that (1) after *Rosemond* and *Rehaif* he could not have been convicted for aiding and abetting Butler's illegal possession of the firearms unless he (Seabrooks) knew at the time of possession that Butler was a convicted felon; (2) the jury was not instructed that Sebrooks needed such knowledge to be convicted on an aiding and abetting theory, and (3) the government offered no evidence that Seabrooks had such knowledge. (DE 17-1:1).

Rather, Seabrooks emphasized, the magistrate had presented only procedural reasons for denying him relief. Specifically, she found that: (1) his aiding and abetting claim was "procedurally barred as it was

decided on direct appeal;" (2) he had not shown that *Rehaif* constituted an intervening change in controlling law; and (3) since *Rehaif* was not a "new rule of constitutional law," it could not be applied retroactively to his case on collateral review. And he objected to each of those findings. (DE 17-1:1-13).

The government filed ***no response*** to that pleading—thus implicitly conceding that Seabrooks' procedural objections were well-founded, and he was entitled to relief on the merits.

### The Court's Order Denying the § 2255 and a COA

Even without any disagreement between the parties as to Seabrooks' entitlement to relief after *Rehaif*, however, the district court denied him relief. On July 16, 2020, it issued an order summarily overruling his objections, adopting the R & R, and denying his § 2255 motion. (DE 19:2). Without addressing any of Seabrooks' objections specifically, the court stated that it "finds Judge Louis' R & R to be well reasoned and correct, and the Court agrees with the analysis in Judge Louis' R & R." According to the court, Seabrooks' objections were "improper because they largely expand upon and reframe arguments

already made and considered by the Magistrate Judge in her R & R or simply disgree with the R & R's conclusions." (DE 19:2).

The court denied Seabrooks a certificate of appealability ("COA") without further explanation. (DE 19:3).

## Legal standard

A COA must issue upon a "substantial showing of the denial of a constitutional right" by the movant. 28 U.S.C. § 2253(c)(2). To obtain a COA under this standard, the applicant must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484, (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Where a court denies a § 2255 on a procedural ground, without reaching the underlying constitutional claim, the movant must show that reasonable jurists could debate both the correctness of the court's procedural ruling as well as whether the petition states a valid claim of a denial of a constitutional right. *Slack*, 529 U.S. at 484.

The Supreme Court has held very clearly that a court "should not decline the application for a COA merely because it believes that the applicant will not demonstrate entitlement to relief." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). Because a COA is necessarily sought in the context in which the petitioner has lost on the merits, the Supreme Court explained: "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Any doubt about whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *See Barefoot*, 463 U.S. at 893; *Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003); *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001).

The Supreme Court recently applied this standard in *Welch v. United States*, 136 S. Ct. 1257 (2016), which arose from the denial of a COA. *Id.* at 1263-64. In that case, the Court broadly held that *Johnson* announced a substantive rule that applied retroactively in cases on

collateral review. *Id.* at 1268. But, in order to resolve the particular case before it, the Court also held that the Court of Appeals erred by denying a COA, because "reasonable jurists could at least debate whether Welch should obtain relief in his collateral challenge to his sentence." *Id.* at 1264, 1268. In *Welch*, the parties disputed whether the defendant's robbery conviction would continue to qualify as a violent felony absent the residual clause, and there was no binding precedent resolving that question. *See id.* at 1263-64, 1268. Accordingly, the Court held that a COA should issue. As explained below, Seabrooks has satisfied the COA standard here.

## Issue

**Reasonable jurists could debate whether in light of the intervening decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), the district court erred in denying Seabrooks' motion to vacate his Count 1 conviction under 18 U.S.C. § 922(g)(1), which – as *per* the court's instructions – could have been predicated on a theory of aiding and abetting his co-defendant's illegal possession of a firearm as a convicted felon, without proof Seabrooks knew his co-defendant was a felon at the time of the gun possession.**

Reasonable jurists could debate the district court's denial of § 2255 relief to Seabrooks in the following three respects.

**1. Reasonable jurists could debate whether Seabrooks' instructional error claim—initially raised under *Rosemond*, but supplemented and confirmed by *Rehaif*—was "procedurally barred."**

While the general rule is that an issue that has been raised ***and decided*** on direct appeal is procedurally barred from review in a subsequent § 2255 proceeding, *see United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000), that rule is simply an application of the "law of the case" doctrine. *See Thomas v. United States*, 572 F.3d 1300, 1343 (11th Cir. 2000). And that doctrine, notably, only applies where the issue has been ***actually decided*** on direct appeal. If the Court of Appeals did ***not*** actually decide the precise issue raised by the defendant subsequently, there is ***no*** "law of the case" bar to the district court's consideration—and resolution—of such an issue in the first instance on collateral review. *See Thomas*, 572 F.3d at 1304 ("law of the case" does not bar consideration of issues that "'could have been, but were not, resolved in earlier proceedings;'" citing *Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir. 1991)).

Here, although the direct appeal panel entertained Seabrooks' challenge to the "aiding and abetting" issue which was (at that time) predicated entirely upon *Rosemond v. United States*, 134 S.Ct. 1240

(2014), the panel did **not** actually "decide" the *Rosemond*-based argument on the merits.  Because Seabrooks had not specifically cited *Rosemond* in opposing the aiding and abetting instruction at the charge conference, the direct appeal panel reviewed his "new" *Rosemond* argument for "plain error" only.  *United States v. Seabrook*s, 839 F.3d 1326, 1337 (11th Cir. 2016).  And pursuant to the plain error standard, the Court ultimately held that it "**need not decide**" "whether a defendant's knowledge that the principal was a convicted felon is an essential element of the offense of aiding and abetting a § 922(g) violation," because neither it nor the Supreme Court had addressed that question, the other circuits were split on the question, and "there can be no plain error when neither the Supreme Court has resolved the issue and other circuits are split."  *Id.*

**No** circuit authority holds that an affirmance under the "plainness" prong on the plain error test works a procedural bar. And that was the only basis for the appellate decision here; the panel was clear that it did "need not" consider Seabrooks claim on the merits.  If the instructional error claim here were based on *Rosemond* alone, it would not be procedurally barred for this reason.

But indeed, Seabrooks' § 2255 claim for relief is no longer based on *Rosemond* alone; it was supplemented by *Rehaif*–an intervening, case-dispositive change in the law—when this case was still before the district court. Seabrooks' *Rosemond/Rehaif* claim ultimately articulated to the district court could ***not*** have been decided by the direct appeal panel because at the time of Seabrooks' direct appeal Eleventh Circuit precedent in *Jackson* was directly contrary to *Rehaif*. Under such circumstances, there plainly was no "procedural bar" precluding the district court from considering Seabrooks' challenge—under both *Rosemond* and *Rehaif*—to the giving of an aiding and abetting instruction, without advising the jury that the government must prove that at the time of the gun possession Seabrooks knew of Butler's prohibited felon status, and without any proof by the government in that regard.

Indeed, even *if* Seabrooks' direct appeal panel had specifically rejected his *Rosemond*-based instructional error claim on the merits, there would still be no preclusive "law of the case" or procedural bar here because *Rehaif* was an "intervening change in controlling law." Notably, one of the well-recognized exceptions to the "law of the case" doctrine is

for an "intervening change in controlling law." *See Davis v. United States*, 417 U.S. 333, 342 (1974) (holding that "if new law has been made ... since the trial and appeal" – the fact that a legal issue was rejected on direct appeal does not preclude a movant from securing § 2255 relief). And indeed, contrary to the mistaken suggestion by the magistrate judge (DE 16:14) adopted by the district court, for purposes of overcoming a procedural bar an intervening change in controlling law need ***not*** be as to controlling constitutional law. The Supreme Court was clear on that point in *Davis*. *See id*. at 346 ("the fact that a contention is grounded not in the Constitution, but in the 'laws of the United States' would not preclude its assertion in a § 2255").

*Rehaif* was indisputably an intervening change in controlling statutory law as to Count 1 given that the Supreme Court abrogated longstanding precedent of this Court in *Jackson*, and the identical law in every circuit in this country by expanding the knowledge requirement for § 922(g). Title 18 U.S.C. § 922(g) provides that "[i]t shall be unlawful" for certain individuals to possess firearms. The provision lists nine categories of individuals subject to the prohibition. In *Rehaif*, the Supreme Court held that the government "must prove both that the

defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200. In other words, an individual is not guilty of a § 922(g) offense unless he had knowledge of his prohibited status within one of the nine categories under the statute at the time he possessed a firearm.

And, by the rationale articulated in *Cannon* and *Rosemond*, even if an individual convicted of aiding and abetting a § 922(g)(1) offense need not have **greater** knowledge than a principal, he must at least have the same knowledge as the principal. As such, after *Rehaif*, an individual convicted of aiding and abetting a § 922(g)(1) offense must have known at the time of the gun possession that the principal was a convicted felon. At the very least, reasonable jurists (even in the Ninth Circuit) would apply *Rosemond* and *Rehaif* together in this way.

## 2. Reasonable jurists could debate whether *Rehaif* is retroactively applicable in a FIRST 2255 case under *Teague v. Lane.*

Under *Teague v. Lane*, 489 U.S. 288 (1989), a Supreme Court decision applies retroactively to cases on collateral review if it announces a rule that is "substantive." *Welch v. United States*, 136 S. Ct. 1257, 1264 (2016). A decision is "substantive" if it "alters the range of conduct or the

class of persons that the law punishes." *Id.* at 1264-65 (citation omitted). As the Supreme Court recognized in *Welch*, "this includes decisions that narrow the scope of a criminal statute by interpreting its terms." *Id.* at 1265 (citation omitted). *See also Schiro v. Summerlin*, 542 U.S. 348, 351 (2004) ("decisions that narrow the scope of a criminal statute by interpreting its terms" apply retroactively because they necesarily carry a significant risk that a defendant stands convicted of an act that hte law does not make criminal.") (internal punctuation and citations omitted).

*Rehaif* is exactly such a decision. Before *Rehaif*, the lower courts had expansively interpreted § 922(g) to punish the possession of firearms by individuals who fell within a prohibited class, even if they did not know that they fell within the class at the time they possessed the firearms. But *Rehaif* narrowed the scope of § 922(g) by interpreting it to require knowledge of one's prohibited status at the time a firearm is possessed. *See Rehaif*, 139 S.Ct. at 2201 (Alito, J. dissenting) (the majority's decision "overturms the long-established interpretation of ... 18 U.S.C. § 9229g), an interpretation that ha[d] been adopted by every single Court of Appeals to address the question"). In overturning this long-standing precedent, the Court altered the range of conduct and class

46

of persons punishable under § 922(g). Therefore, *Rehaif* announced a substantive rule that is retroactive.

The Supreme Court's decision in *Bousley v. United States*, 523 U.S. 614 (1998), reinforces that *Rehaif* is retroactive. In *Bousley*, 523 U.S. at 620-21, the Supreme Court held that its decision in *Bailey v. United States*, 516 U.S. 137 (1995), was substantive, and therefore, retroactive. In *Bailey*, the Supreme Court construed 18 U.S.C. § 924(c)(1), which at the time, only criminalized the "use" or "carr[ying]" of a firearm during and in relation to a crime of violence. Previously, some lower courts had interpreted the "use" language in the provision to require only accessibility and proximity to the firearm, not active employment of the firearm. But in *Bailey*, the Supreme Court held that "active employment" of the firearm was required under § 924(c)(1). 516 U.S. at 144. In *Bousley*, the Supreme Court ruled that *Bailey* announced a substantive (and, therefore, retroactive) rule because it narrowed the scope of the § 924(c) statute by holding that the statute "does not reach certain conduct"—i.e., the non-active use of a firearm. *Bousley*, 523 U.S. at 620. Likewise, *Rehaif* announced a substantive (and, therefore, retroactive) rule because it narrowed the scope of the § 922(g) statute by holding that

47

it does not reach certain conduct—i.e., the possession of a firearm by a defendant who, at the time, had no knowledge of his prohibited status.

Correctly applying these controlling precedents, the government has conceded in multiple cases that *Rehaif* is indeed a new rule of substantive law that is retroactively applicable to ***firs***t 2255 cases. *See, e.g. Earl Thompson v. United States*, Case No. 16-22670-civ-KING, DE28: (S. D. Fla. July 26, 2019) (conceding , in a first § 2255 case, that because *Rehaif* narrowed the 'class of persons that the law punishes' under Sections 922(g) and 924(a), it is retroactive on collateral review; citing *Welch*, 136 S.Ct. at 1257); *United States v. Nahas*, Case No. 1:17-cr-10-JCC, DE 50:5 (E.D. Va. July 13, 2020) (agreeing "that *Rehaif* is retroactive on collateral review;" citing *Welch v. United States*, 136 S. Ct. 1257, 1267 (2016); *Teague v. Lane*, 489 U.S. 288 (1989); and *Davis v. United States*, 417 U.S. 333, 346 (1974)); *United States v. Atiba Warren*, Case No. 13-270, DE 279:1-2 (W.D. Pa. March 24, 2020) ("The position of the Department of Justice is that courts *should* retroactively apply the decision in *Rehaif* to collateral attacks under 28 U.S.C. § 2255.").

Notably, consistent with the position of the Department of Justice in these cases, Judge Rosenbaum explained in her special concurrence in *In re Palacios*, 931 F.3d 1314 (11th Cir. July 30, 2019), that:

> *Rehaif* announced the same type of new rule of statutory law that *Bailey* did. In both cases, the Supreme Court issued a "decision[ ] ... holding that a substantive federal criminal statute does not reach certain conduct" that, before the applicable Supreme Court decision, courts routinely applied to reach non-covered conduct. *See Bousley*, 523 U.S. at 620, 118 S.Ct. 1604. As a result, as the Court determined in *Bousley* with respect to the pre-*Bailey* applications of § 924(c)(1), pre-*Rehaif* applications of §§ 922(g) and 924(a)(2) "necessarily carry[y] a significant risk that a defendant stands convicted of an act that the law does not make criminal." *Id.* And "it would be [just as] inconsistent with the doctrinal underpinnings of habeas review to preclude [a prisoner] from relying on [the Supreme Court's] decision in [*Rehaif*] in support of his claim that his [conviction under §§ 922(g) and 924(a)(2)] was constitutionally invalid," *id.* at 621, 118 S.Ct. 1604, as the Supreme Court determined it would be be to preclude a prisoner from invoking *Bailey* to support his habeas claim that his conviction under § 924(c) was invalid.
>
> ***In short, Bailey and Bousley demand the conclusion that Rehaif announced a new rule of substantive law that is necessarily retroactively applicable under Teague. See also Montgomery v. Louisiana, ___ U.S. ___, 136 S.Ct. 718, 729, 193 L.Ed.2d 599 (2016) ("substantive rules must have retroactive effect regardless of when the defendant's conviction became final"). That means a prisoner with a Rehaif claim must be able to seek habeas relief.***

*In re Palacios*, 931 F.3d at 1317 (emphasis added).

In *In re Palacios*, Judge Rosenbaum explained, it was impossible for the movant to seek habeas relief because he was in a "second or successive" posture, *id.*, and – as the panel had rightly noted in denying his request for authorization of a ***successive*** motion raising a *Rehaif* claim – the authorization of "second or successive" § 2255 motions are limited by 28 U.S.C. § 2255(h), ***only*** to those that contain a claim involving "a new rule of ***constitutional*** law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *Id.* at 1315 (Rosenbaum, J., concurring in the panel's order denying authorization of Palacios' successive motion because *Rehaif* did not set forth a rule of constitutional law); *id.* (panel order refusing to authorize successive §2255 motion because applicant "fails to meet the statutory criteria" in § 2255(h)(2) because *Rehaif* did not announce a "new rule of constitutional law"); *see also In re Wright*, 942 F.3d 1063, 1067 (11th Cir. 2019) (Rosenbaum concurring) ("[N]ew substantive rules of statutory law are retroactively applicable on collateral review to the extent that new substantive rules of constitutional law are. Indeed, *Welch* teaches that the Supreme Court does not distinguish between the

retroactivity of new substantive rules of law that are statutory in nature and those that are constitutional in nature").

In emphasizing that "*Rehaif* does not constitute a new rule of constitutional law" and suggesting that the more stringent § 2255(h)(2) retroactivity standard (requiring a new rule of **constitutional** law) governs Seabrooks' **first** § 2255 motion (DE16:18-19), the magistrate judge and district court confused the standards governing **first** and **second/successive** § 2255 motions. As a threshold matter, they ignored the very precise words Congress wrote in § 2255(h), which require a "new rule of constitutional law" **ONLY** when a movant seeks authorization for a second or successive § 2255 motion. They also failed to acknowledge, and indeed improperly ignored, the directly-on point Supreme Court precedents in *Teague*, *Welch*, and *Bousley*, which govern the retroactivity determination for all other cases on collateral review (that is, *first* § 2255 cases).

As Judge Rosenbaum explained in *In re Palacios* and *In re Wright,* for a first § 2255 case the only requirement for retroactivity is a new rule of **substantive** law – statutory or constitutional. And finally, by referencing district court orders that clearly over-read the holding of *In*

*re Palacios* – itself a second or successor case – the magistrate judge and district court also ignored the well-settled rule in this Circuit that "regardless of what a court says in its opinion, the decision can **hold** nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010( (Ed Carnes, J.) (emphasis added). *See also Welch v. United States*, 958 F.3d 1093 (11th Cir. May 20, 2020) (opinion on remand from the Supreme Court, distinguishing between *dicta* and holding in the prior panel decision in Welch's case; reiterating the rule from *Edwards* that "[D]icta is not binding on anyone for any purpose").

Given the above argument and authority, reasonable jurists could certainly debate whether *Rehaif* is retroactively applicable in a first § 2255 case, such as this one. Indeed, in *North v. United States*, 2020 WL 2873626 (N.D.Ga. May 14, 2020), Judge Grimberg easily recognized that *In re Palacios* had **only** held that *Rehaif* is not retroactively applicable to support a second or successive § 2255 motion, and that "the circuit court has not determined whether *Rehaif* applies retroactively to petitioners filing their first § 2255 motion." *Id.* at *2. *See also United States v. Dace*, 2020 U.S. Dist. LEXIS 114539, ** 13-14 (D. Colo. June 24, 2020) ("I find that the Supreme Court in *Rehaif* announced a new rule, and that new

rule applies retroactively to cases on collateral review because it is a substantive rather than procedural rule.").

By contrast to cases in a second or successive posture, in a ***first*** § 2255 case the retroactivity determination (under *Teague*) need ***not*** be "made by" the Supreme Court. It may be made by a court at any level, including this Court in this proceeding. *See Dodd v. United State*s, 365 F.3d 1273, 1278 (11th Cir. 2004) (noting that every circuit to have considered the issue had concluded that both district courts and courts of appeals may make the retroactivity decision under *Teague* for a first § 2255; citing *Garcia v. United* States, 278 F.3d 1210, 1213  n. 5 (11th Cir. 2002)), *aff'd*, 535 U.S. 353 (2005)).

Accordingly, reasonable jurists could find—based upon *Teague*, *Welch*, and *Bousley*, and for the reasons stated by Judge Rosenbaum in *In re Palacios* and *In re Wright*—that because *Rehaif* sets forth a new rule of substantive statutory law, it is retroactively applicable in this first § 2255, and the heightened retroactivity standard of 28 U.S.C. § 2255(h)(2) requiring a new rule of constitutional law made retroactive by the Supreme Court is inapposite.  It ***only*** applies to "second or successive" motions.  At the very least, reasonable jurists could so conclude.

With all procedural obstacles thus cleared, reasonable jurists would have found that Seabrooks had indeed made a substantial showing of the denial of a constitutional right with regard to his Count 1 conviction.

**3. Reasonable jurists could debate whether – in light of *Rosemond* and *Rehaif* -- Mr. Seabrooks was convicted on Count 1 in violation of his Fifth and Sixth Amendment rights, and whether those constitutional defects in the Count 1 conviction warrant relief here.**

The district court's giving of an aiding and abetting instruction as to Count 1, without a correct instruction as to every element of the Count 1 offense as per *Rehaif,* and without any evidence of record that Seabrooks knew Butler was a felon at the time of the gun possession violated Seabrooks' constitutional rights in multiple respects. Specifically, this amalgam of errors violated his Fifth Amendment right to due process of law; his Sixth Amendment right to a jury trial; and his Sixth Amendment right to have a complete verdict on every element of the offense. *See Jackson v. Virginia*, 443 U.S. 307, 313-316 (1979) (conviction without proof beyond a reasonable doubt as to every element of an offense is a denial of due process); *Neder v. United States*, 527 U.S. 1 (1999) (failure to instruct on an element of an offense is an error of constitutional proportion).

Notably, in *United States v. Medley*, 972 F.3d 399 (4th Cir. Aug. 21, 2020), reasonable jurists in the Fourth Circuit found that these precise constitutional violations occurred due to a district court's failure to instruct a jury on the knowledge-of-status element, consistent with *Rehaif*. *See id.* at 411-19. While this Court has disagreed with the Fourth Circuit as to whether such errors are sufficiently prejudicial to warrant reversal under prongs three and four of the plain error standard in *United States v. Olano*, 507 U.S 725 (1993) if there is evidence of record (even in the pre-sentence report) that the defendant knew of his felon status at the time he possessed a firearm, the Court has nonetheless acknowledged that the failure to instruct a jury consistent with *Rehaif* as to the knowledge-of-status element at the very least meets prongs one and two of *Olano*. *See United States v. Reed*, 941 F.3d 1018, 1021-22 (11th Cir. 2019) (finding such instructional error "plain" after *Rehaif*); *United States v. Moore*, 954 F.3d 1322, 1337-38 (11th Cir. 2020) (same). And notably, where there is little or no evidence in the record to satisfy the knowledge-of-status element, the Court has found prongs three and four of *Olano* met as well, and reversed under the plain error standard. *See United States v. Russell*, 957 F.3d 1249, 1254 (11th Cir. 2020).

Admittedly, this case is different from *Russell* because in *Russell* the only basis for conviction on the § 922(g) count was the defendant's own possession of the firearm. No aiding and abetting alternative was presented to the jury. Post-*Rehaif*, the Court has not considered a record like the instant one where (1) the jury was instructed that it could find a defendant guilty of actually/constructively possessing firearms himself in violation of § 922(g)(1), **_or_** aiding and abetting his co-defendant's § 922(g)(1) offense; (2) the court did not instruct the jury that knowledge-of-felon status was an element of any § 922(g)(1) offense; and (3) there was no evidence before the jury that the defendant/aider and abettor knew at the time of the offense that the principal was a convicted felon.

Based upon the above authorities, reasonable jurists could certainly find – or at least debate whether – such a conviction should be reversed under prongs three and four of *Olano* on direct appeal. And they could also debate whether the general harmless error standard for cases on collateral review, set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), is met as well.

Pursuant to *Brecht,* there must be a showing that the error had a "substantial and injurious effect or influence in determining the jury's

verdict." *Id.* at 623. Assuming that the entire record may be consulted in making that determination, here such a review does ***not*** show the instructional error was harmless. To the contrary, what an entire record review shows here is that the government presented an extremely weak case for guilt on its original actual/constructive possession theory (confirmed by the jury's question); the government presented no evidence that Seabrooks knew Butler was a convicted felon at the time of his illegal gun possession (crucial for its alternative aiding and abetting theory); in closing and rebuttal argument, both prosecutors urged the jury toward conviction on the clearly-unsupported aiding and abetting theory; and the jury returned a general verdict. On this record, reasonable jurists could easily conclude that the giving of an aiding and abetting instruction coupled with the erroneous § 922(g)(1) instruction, had a "substantial and injurious effect or influence in determining" the jury's Count 1 verdict.

To be clear, the *Brecht* standard is not an extremely burdensome one. It is met even if the Court is in "equipoise" as to whether an instructional error is harmful or harmless. In *O'Neal v. McAninch*, 513 U.S. 432 (1995), the Supreme Court clarified that if a federal court on collateral review is in virtual "equipoise" as to whether an error is

harmless, it must "treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict'). Thus, even if the Court were unsure as to the actual effect of the instructional errors given the general verdict, and it remains in "equipoise" on that point, "equipoise" clearly satisfies the collateral review reversal standard of *Brecht*.

In short, whatever standard is used to evaluate prejudice here, upon consideration of the entirety of the record in this case reasonable jurists could find that prejudice from the giving of the aiding and abetting instruction together with the erroneous § 922(g)(1) instruction has been shown here. Accordingly, the Court should grant Seabrooks a COA to challenge his Count 1 conviction in light of *Rehaif*.

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

By:   */s/ Brenda G. Bryn*
Brenda G. Bryn
Assistant Federal Public Defender
One E. Broward Boulevard, Suite 1100
Fort Lauderdale, Florida 33301
Tel:  (954) 356-7436

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this pleading complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 37(a)(7)(B), because it contains 12,284 words, excluding the parts of the pleading exempted by Fed. R. App. P. 32(f). This pleading also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook font.

*s/Brenda G. Bryn*
Brenda G. Bryn

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/Brenda G. Bryn*
Brenda G. Bryn
